IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DEWAYNE M.,[1]

        Plaintiff,

vs.

COMMISSIONER of SOCIAL SECURITY,

        Defendant.

Case No. 17-cv-967-CJP[2]

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for disability benefits in February 2015, alleging disability as of April 29, 2012. After holding an evidentiary hearing, ALJ P. H. Jung denied the application on March 15, 2017. (Tr. 20-29). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1).

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 27.

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ did not properly consider plaintiff's RFC in that he ignored medical evidence explaining why plaintiff resided in a skilled nursing facility for more than two years during the period in issue.

2. The ALJ gave too much weight to the opinions of the state agency consultants.

**Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience

significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014). However, while

judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Jung followed the five-step analytical framework described above.  He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.  He was insured for DIB through December 31, 2016.[4]

The ALJ found that plaintiff had severe impairments of diabetes mellitus, peripheral neuropathy, hypertension, GERD, and depression.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level with some physical and mental limitations.  Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not able to do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1977.  He was 34 years old on the alleged onset date. (Tr. 204).  He was residing in a nursing home when he applied. (Tr. 206).  He

---

[4] The date last insured is relevant only to the claim for DIB.

went to school through the 12th grade and was in special education classes. He also took a truck driving course and had gotten a commercial driver's license. (Tr. 210).

Plaintiff said he was unable to work because of diabetes, schizophrenia, anxiety, hypertension, major depression, insomnia, and intestinal infections. (Tr. 209).

He had worked as a security officer, truck driver, and restaurant cook. (Tr. 221).

Plaintiff submitted a function report in April 2015 indicating that he was living in a nursing home. He went to therapy in the morning to work on strength and to help him walk without pain. He had been using a cane since February 2014. (Tr. 233-234, 239).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in December 2016. (Tr. 37).

Plaintiff was covered by Medicaid. (Tr. 40). He had diabetes which was out of control, pain in his hips and joints, neuropathy, and depression. He had to use the bathroom frequently. He had problems from a c. diff. infection. He used a cane because he had dizziness and balance problems. (Tr. 42-43).

Plaintiff was homeless for a while and had difficulty getting his medications. Even when he was in the nursing home and regularly took his medications, his symptoms did not get better. He weighed over 300 pounds in 2009. When he

found out he had diabetes, he lost over 200 pounds. (Tr. 43-44).

At the time of the hearing, he was being treated by Dr. Grainger of the "East St. Louis Health District." He got his medications by mail. His diabetes was still uncontrolled. (Tr. 44-45). He was staying with a friend temporarily until he could find somewhere else to go. He had not gone back into a nursing home because they said he was "too independent." (Tr. 46).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the ultimate RFC findings, that is, a person who could do work at the sedentary exertional level, stand/walk 2 hours in an 8 hour workday, and sit 6 hours in an 8 hour workday; limited to no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no frequent exposure to extreme cold, wetness, vibration, or environmental irritants; limited to noise level 3; no exposure to hazards, machinery, or heights; and limited to simple, routine, repetitive tasks. The VE testified that this person could not do plaintiff's past work. However, a person with this RFC could do other jobs such as telephone quotation clerk, addresser, and document preparer. (Tr. 50).

### 3. Medical Records

Plaintiff was admitted to the hospital through the emergency room in August 2012. He had previously been diagnosed with diabetes and was supposed to be taking insulin and metformin, but he had been out of his medications since May. He had lost a lot of weight. His blood sugar was over 400. He was kept overnight

and given insulin. (Tr. 277-278).

Plaintiff was admitted to the hospital through the emergency room in June 2013. He had bloody diarrhea for a week. He was diagnosed with infectious diarrhea, dehydration, and poorly controlled diabetes. He was treated with antibiotics and insulin. He had not been taking his insulin regularly. (Tr. 284-285). He told a nurse that he could not afford medications, a doctor, or transportation. She arranged for a social worker consult to help him with "multiple needs." (Tr. 291).

Plaintiff was again admitted to the hospital in July 2013 after voicing suicidal ideation. He admitted that he said he was suicidal because he was homeless and needed a place to go. His diabetes was again uncontrolled. He was diagnosed with acute stress reaction, learning disability, and diabetes. On mental status examination, he was below average in intelligence, fund of knowledge, insight, and judgment. It was noted that he felt depressed for most of the day on most days. His weight had dropped from 230 pounds to 135 pounds over the last 2 years due to diabetes and lack of support and lack of housing. (Tr. 308-309).

Plaintiff went to the emergency room on January 11, 2014, with high blood sugar. He was homeless and was staying with an aunt. His "meds were pitched, weeks ago." His former fiancée stated "he was incontinent of bowel and bladder, she gave him a shower." (Tr. 360). His friend (who might be the same person as the former fiancée) stated that he was "being taken advantage of at his current living space, she thinks he is being beaten." He had leg pain from neuropathy. (Tr.

353). He was admitted with hyperglycemia. (Tr. 358). He was discharged after two days to an extended care facility. The final diagnoses were diabetes, history of hypertension, and schizophrenia. (Tr. 361-362, 398).

Plaintiff was admitted to Atrium Healthcare and Rehabilitation Center upon his discharge from the hospital on January 14, 2014. (Tr. 547). The transcript contains progress notes from Atrium from admission through August 2015. (Tr. 547-611, 617-633). There are also occupational and physical therapy records from January 2014 through March 2015. (Tr. 449-500). He was diagnosed with a number of problems, including diabetes, schizophrenia, anxiety, and depression. (Tr. 547). In September 2014, plaintiff left on a short "leave of absence" with his family. When he returned to the facility two days later, it was noted that he had fallen while attempting to walk from the living room to the bathroom. He had 3 stitches in his chin. (Tr. 603). In October 2014, it was noted that he walked with a cane because of left paresis. (Tr. 557). To add to his problems, he contracted a c. diff. infection in December 2014.[5] He was treated with antibiotics and placed on contact isolation status. (Tr. 598). He had several courses of antibiotics and remained in isolation until January 24, 2015. (Tr. 588). In March 2015, his diabetes was still uncontrolled and his A1C level was high at 8.8. He was walking with a cane. (Tr. 566).

---

[5] "Clostridium difficile ... often called C. difficile or C. diff, is a bacterium that can cause symptoms ranging from diarrhea to life-threatening inflammation of the colon." https://www.mayoclinic.org/diseases-conditions/c-difficile/symptoms-causes/syc-20351691, visited on July 19, 2018.

Plaintiff was seen regularly by a psychiatrist while in the extended care facility. He was prescribed psychotropic drugs, including Celexa and Trazodone. (Tr. 619-621).

There are no records from the extended care facility after August 2015. There is no formal discharge record from the extended care facility in the transcript.

Plaintiff was still living at the extended care facility in November 2015. He was taken from there to the hospital for treatment of an abscess on his cheek. (Tr. 708).

In March 2016, plaintiff went to the emergency room because of high blood sugar. He said had been discharged from the nursing home a few weeks earlier and had run out of his medications. (Tr. 693).

In April 2016, plaintiff's A1C was high at 11.9. The lab result states that glycemic control for adults with diabetes is in the range of less than 7.0. (Tr. 650).

Plaintiff was admitted to the hospital in May 2016 through the emergency room. Per EMS, his blood sugar was 400. He was diagnosed with diabetic ketoacidosis. (Tr. 746-761).

Plaintiff received primary health care from a nurse practitioner at Southern Illinois Healthcare Foundation in April and May 2016. Her notes indicate he had been in the nursing home for two years for uncontrolled diabetes and was discharged on March 17, 2016. He had a history of schizophrenia. (Tr. 907). She noted that his blood sugars were high and he was noncompliant with

medications, blood sugar monitoring, and follow-up. He was noted to be out of insulin. He had diabetic neuropathy, for which he was prescribed Gabapentin. His gait was normal. He had poor insight into the importance of medication compliance in the management of his diabetes. (Tr. 905-911).

Plaintiff was seen again in the emergency room for hyperglycemia in September 2016. (Tr. 781-785). He went to the emergency room in October 2016 following a motor vehicle accident. He had a history of diabetes and peripheral neuropathy with caused him to walk with a cane at baseline. His blood sugar was high. He was diagnosed with a strain of the neck and shoulder. (Tr. 789-794).

Plaintiff was taken to the emergency room by ambulance in November 2016. He was picked up by the ambulance at a park in East St. Louis, Illinois. Past medical history included diabetes and psychiatric problems. He said he felt weak and sick. He had not eaten in several days and had not had his insulin for months. His blood sugar was so high that the glucometer could not read it. He was admitted to the hospital with diagnoses of diabetic ketoacidosis. (Tr. 920-. He said he had been in a nursing home and wanted to go back. Social services was to assess him for nursing home placement. (Tr. 937). There is no record of such an assessment. He also said he was homeless and had not had his medications in almost a year. He had neuropathy and hurt "all over." (Tr. 953). His A1C was 17.5. (Tr. 947). He was treated with insulin and other medications and was discharged to home the next day. (Tr. 964-967).

### 4. Consultative exams

Harry Deppe, Ph.D., performed a consultative psychological exam in September 2015. (Tr. 634-637). He said he reviewed records from Dr. Jung. (Dr. Jung saw plaintiff while he was hospitalized after his suicide threat in July 2013. Dr. Jung diagnosed acute stress reaction and learning disability. Tr. 310-311.) Plaintiff was living in the nursing home at the time of Dr. Deppe's exam. He said he was seen by a psychiatrist there, but was not taking any psychotropic medications. Dr. Deppe concluded that plaintiff's fund of general knowledge was good and his judgment and insight were adequate. He concluded that plaintiff had intact ability to relate to others, to understand and follow simple instructions, to maintain attention, and to withstand the stress associated with day to day work activity.

Dr. Vittal Chapa performed a consultative physical exam in the same month. (Tr. 638-646). He reviewed unspecified medical records from July 2013. The exam was normal except for peripheral neuropathy and a small ulcer on the right foot.

### Analysis

The ALJ's discussion of the medical evidence relating to plaintiff's stay in an extended care facility is brief and inaccurate.

In his discussion of whether plaintiff's impairments met or equaled a Listing, the ALJ stated that "During much of the adjudication period, the claimant was in

rehab, and as he characterizes it, he lived in a nursing home and his meals were prepared." (Tr. 23). In his discussion of the medical evidence, The ALJ said that plaintiff was referred for "rehab services" at Atrium in July and October 2014, his plan of care was certified to November 2014, and he underwent rehab therapy again in March 2015. (Tr. 26). His wording suggests that he understood this treatment to be several periods of *outpatient* rehabilitation therapy.

In reality, plaintiff was an *inpatient* at Atrium from January 2014 through March 2016. The ALJ's discussion of the evidence gives no hint that he understood that. He failed to grapple with the evidence indicating that, even while he was an inpatient at Atrium, his blood sugars were not in control. He noted that plaintiff often sought treatment for his diabetes at the emergency room, but did not consider the reason why. The record suggests that, when he was not residing in the nursing home, plaintiff had difficulty obtaining the necessary medications and lacked insight into the importance of consistently taking them correctly.

The ALJ acknowledged that plaintiff "was assessed with schizophrenia" at Atrium. (Tr. 26-27). However, the ALJ did not discuss the diagnosis and treatment for schizophrenia and did not explain why he apparently rejected that diagnosis in favor of a finding that plaintiff had depression. He gave "partial weight" to Dr. Deppe's opinion, but it must be noted that Dr. Deppe did not say that he reviewed the records from Atrium and was seemingly unaware that plaintiff was being treated for schizophrenia at the time of his examination. Plaintiff told Dr. Deppe that he saw a psychiatrist in the nursing home, but was not taking any

psychotropic medications. That was, of course, incorrect.

While it is true that an ALJ is not required to discuss every piece of evidence in the record, it is well-established that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), collecting cases. Here, the ALJ either failed to understand or ignored the fact that plaintiff was an inpatient in an extended care facility for over two years during the period in issue. At a minimum, he was required to reconcile that fact with his conclusion that plaintiff was not under a disability at any time from the alleged onset date through the date of the decision. See, *Lambert v. Berryhill*, ___ F.3d ___, 2018 WL 3470994, *5 (7th Cir. July 19, 2018)("The government also argues that under the Social Security Act, Lambert needed to prove that he was unable to work for an identifiable, continuous 12-month period. This argument misreads the statute. The Act does not specify how long a claimant must be unable to engage in substantial gainful activity. Instead it is the claimant's "medically determinable physical or mental impairment" that must have "lasted or can be expected to last for a continuous period of not less than 12 months.")

The Commissioner's brief argues, in essence, that the ALJ is not required to comment on every piece of evidence in the record. While that is correct, it is also true that an ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, he "must at

least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The Court must conclude that ALJ Jung failed to build the requisite logical bridge here. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2010), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

In view of the disposition of plaintiff's first point, a discussion of his second point is not required. However, on remand, the opinions of the state agency consultants should be reweighed in light of the ALJ's consideration of all of the medical evidence in the record.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner

for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   July 20, 2018.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**